745 S.E.2d 124

**The STATE, Respondent,**

v.

**Kendrick TAYLOR, Appellant.**

**Appellate Case No. 2009–143506.**

**No. 5084.**

Court of Appeals of South Carolina.

Heard Sept. 11, 2012.

Decided Feb. 20, 2013.

Withdrawn, Substituted and Refiled May 22, 2013.

508

Chief Appellate Defender Robert M. Dudek, of Columbia, for Appellant.

Attorney General Alan McCrory Wilson, Chief Deputy Attorney General John W. McIntosh, Senior Assistant Deputy Attorney General Salley W. Elliott, and Senior Assistant Attorney General W. Edgar Salter, III, all of Columbia, for Respondent.

THOMAS, J.

Kendrick Taylor appeals his conviction for murder, arguing the trial court erred in (1) refusing to allow him to cross-examine the State's chief witness regarding unrelated charges against the witness that the State dismissed after the witness gave a statement implicating Taylor in the present case and

(2) allowing the State to introduce a SLED report prepared in connection with the matter. We affirm.

## FACTS AND PROCEDURAL HISTORY

On September 13, 2008, at 2:20 a.m., Forrest Johnson, a patrol officer with the North Charleston Police Department, received a call about a shooting in a residential neighborhood. Upon arriving at the scene, Johnson noticed the lifeless body of a middle-aged male, who was later identified as Scott Yelton. Yelton bled profusely on the left side of his face, and a great deal of blood soaked through his clothes. Johnson learned that Yelton had been involved in a disagreement involving a car and ended up either exiting the car or being forcibly ejected from it.

After examining contact numbers stored in Yelton's telephone, police located Joshua Wilder at his grandmother's house. Wilder voluntarily went to the police station; however, he did not provide truthful information about his involvement in Yelton's death and told police that he was asleep at his girlfriend's house when the incident occurred.

The day after Wilder met with the police, a pistol was found on the premises of AAA Rentals by Denise Berto, whose family owned the business. Berto gave the pistol to the North Charleston Police Department. Swabs taken from the pistol were sent to SLED on October 1, 2008. SLED test-fired the weapon and found it matched shell casings found at the scene. In addition, a detective with the North Charleston Police Department learned that the pistol had been in Taylor's possession. Both Wilder and Taylor were developed as suspects in the crime.

In October 2008, police arrested both Wilder and Taylor in connection with Yelton's death and charged them with murder. While in police custody, Wilder agreed to cooperate with the authorities. The charges against Wilder regarding his involvement in Yelton's death were then changed to accessory after the fact of murder.

According to Wilder, he and other drug dealers would give Yelton money or drugs in exchange for the use of Yelton's truck. During the early morning hours immediately preceding Yelton's death, Wilder drove his car, with Taylor in the front passenger seat, to Yelton's residence to "rent the truck."

Yelton, who was drunk and high when he met Wilder and Taylor, told them he had already lent his truck to someone else and was waiting for its return. Yelton then got into the back seat of the car that Wilder was driving and demanded money. Wilder and Taylor asked Yelton to leave, but Yelton refused.

At trial, Wilder testified that Taylor turned and struck Yelton with a gun in order to make him exit the vehicle. Yelton began bleeding, but resisted efforts to pull him from the car. By this time, Yelton's cousin arrived at the scene and attempted without success to extricate Yelton. According to Wilder, Taylor, already worried about blood inside the car, "flipped out" when Yelton threatened to call the law and shot Yelton several times after both Taylor and Yelton had exited the car. Taylor returned to the passenger seat of the car, and Wilder, in shock from the incident, drove away. As they proceeded, Taylor cautioned Wilder to "keep everything silent" and not to say anything to the police. A few days later, Taylor told Wilder that "he [Taylor] had to throw the gun" and wanted Wilder to look for it.

In July 2009, Taylor was indicted for Yelton's murder. His trial took place that same month. Wilder appeared as a witness for the State. Taylor did not take the stand; however, family members testified he was asleep at the time of the shooting.

The jury found Taylor guilty of murder, and the trial judge sentenced him to life imprisonment. Taylor then filed this appeal.

## ISSUES

I. Did the trial court abuse its discretion in refusing to allow Taylor to cross-examine Wilder about charges against him that had been dismissed a few months before trial but were pending when Wilder gave a statement implicating Taylor in Yelton's murder?

II. Should the trial court have excluded a SLED ballistics report on the ground that it constituted impermissible bolstering of trial testimony?

## STANDARD OF REVIEW

An appellate court "will not disturb a trial court's ruling concerning the scope of cross-examination of a witness to test his or her credibility, or to show possible bias or self-interest in testifying, absent a manifest abuse of discretion." *State v. Gracely*, 399 S.C. 363, 371, 731 S.E.2d 880, 884 (2012). "A trial judge's decision regarding the comparative probative value and prejudicial effect of evidence should be reversed only in exceptional circumstances." *State v. Adams*, 354 S.C. 361, 378, 580 S.E.2d 785, 794 (Ct.App.2003). "We review a trial court's decision regarding Rule 403, [SCRE] pursuant to the abuse of discretion standard and are obligated to give great deference to the trial court's judgment." *Id.* As with any issue regarding the admissibility of evidence, a trial court's decision to admit evidence notwithstanding an objection that it amounts to improper bolstering is to be reviewed on appeal under an abuse of discretion standard. *State v. Whitner*, 399 S.C. 547, 563, 732 S.E.2d 861, 867 (2012).

## LAW/ANALYSIS

### I. Cross–Examination Regarding Dismissed Charges

Taylor first argues the trial court should have allowed him to cross-examine Wilder about unrelated charges that were pending against Wilder when Wilder implicated Taylor in Yelton's murder and about the dismissal of those charges before Taylor's case was called to trial. We disagree.

Before Wilder's testimony began, both sides agreed that Taylor could cross-examine Wilder about prior convictions for breach of trust and shoplifting and that Wilder's convictions for simple possession of marijuana and driving under suspension would not be admissible. The trial court also stated it would admit a conviction for felony possession of cocaine and allow Taylor to (1) question Wilder about his pending charges, including any charges related to the present case and certain unrelated drug offenses and (2) suggest that Wilder might be testifying for the State to obtain a better deal for himself.

The only dispute concerned the admissibility of unrelated charges that were pending against Wilder when he agreed to cooperate in prosecuting Taylor for Yelton's murder. The pending charges included three counts of assault with intent to

kill, one count of discharging a firearm into a car, and two counts of unlawful possession of a gun. These charges were dismissed in May 2009 by the same solicitor who was prosecuting Taylor in the present case. Taylor argued the dismissals were probative of Wilder's bias, further noting the disposition sheet said only that the charges were "nol prossed in the interest of justice."

The solicitor opposed allowing Taylor to question Wilder about the May 2009 dismissals or the corresponding charges, stating he dropped the charges because they were old and the lead officer on the cases had been arrested and indicted. The solicitor further advised the trial court that Wilder would testify that no promises or threats had been made to influence his testimony. Although Taylor offered to stipulate that the officer had been arrested and the arrest may have been a reason for the dismissals, the solicitor refused to agree to the stipulation, explaining he "cut these cases loose" as soon as the officer was indicted and the dismissals were not part of any deal with Wilder.

The trial court ruled Taylor could not impeach Wilder with the dismissed charges. In so ruling, the court stated the information was unfairly prejudicial. The court further found that neither the charges nor their dismissals were related to the present case; therefore, to allow information about them was likely to confuse the jury and require the solicitor to testify under oath about his reasons for dismissal.

■ Under Rule 403, SCRE, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."[1] We agree with the trial court that the probative value of the information that Taylor sought to elicit from Wilder did not justify making the solicitor take the stand to testify about his reasons for dismissing the charges.[2] The

---

1. At oral argument, counsel for both sides agreed that a determination of this issue should be analyzed under Rule 403, SCRE.

2. As the State notes in its brief, the South Carolina Rules of Professional Conduct allow a lawyer to act as an advocate in a trial in which the

probative value of the information in dispute was limited at best. Other than the fact that the charges were dismissed after Wilder implicated Taylor, there was no evidence linking the dismissals to Wilder's decision to cooperate with the police. To the contrary, the record indicates Wilder gave a statement against Taylor soon after his arrest, but the unrelated charges pending against him were not dismissed until several months later. Furthermore, Taylor was allowed to impeach Wilder on other felony charges that were still pending as well as on certain prior convictions; thus, he already had the means to attack Wilder's credibility and emphasize his motive to testify untruthfully. Balancing the limited probative value of the information against the possible confusion of the issues that would arise from requiring the solicitor to testify under oath about why he dismissed the charges and the delay that would result if such testimony required a substitution of counsel for the State, we hold the trial court acted within its discretion in refusing to allow Taylor to question Wilder about them.[3]

## II. Admissibility of SLED Ballistics Report

■ Taylor also challenges the admission of a SLED report, arguing it constituted impermissible bolstering of the trial testimony of the SLED firearm and tool-mark examiner. We find no error.[4]

---

lawyer is likely to be a necessary witness only in certain limited circumstances, none of which are applicable here. Rule 3.7, RPC, Rule 407, SCACR.

3. We are aware that in the recent decision of *State v. Gracely*, 399 S.C. 363, 374–75, 731 S.E.2d 880, 886 (2012), the Supreme Court of South Carolina reversed and remanded the defendant's conviction, holding "[t]he fact that a cooperating witness avoided a *mandatory minimum* sentence is critical information that a defendant must be allowed to present to the jury." (emphasis in original). In *Gracely*, however, it appears undisputed that the minimum sentences avoided by the cooperating witnesses were for charges that were reduced in exchange for those witnesses' cooperation with the State.

4. As noted in the opinion, the State proffered two reports prepared by Suzanne Cromer, its firearm and tool-mark identification examiner. Exhibit 40 noted only that the pistol could not be excluded as the weapon from which the fired projectiles were shot, and Exhibit 41 contained Cromer's findings that the seven fired cartridge casings came

The State called Suzanne Cromer, a SLED firearm and tool-mark examiner. Cromer examined seven fired cartridge casings, four fired bullets, and the pistol found by Berto. The pistol had four unfired .40 S & W cartridges. Cromer testified the unfired rounds were the same brand as the fired cartridge casings, but she ultimately determined only that she could not rule out the pistol as the firearm from which the fired projectiles were shot. After Cromer testified about these results, the State offered her report, Exhibit 40, into evidence. Taylor objected, arguing that Cromer already testified about the results and the report would be either cumulative or impermissible bolstering. The trial court overruled Taylor's objections and admitted the report.

Based on further testing, Cromer also determined that the seven fired cartridge casings were fired from the pistol. The State offered the corresponding report, Exhibit 41, into evidence, and Taylor objected to this evidence on the ground that it was cumulative or impermissible bolstering. The trial court admitted the report over Taylor's objection as well.

On appeal, Taylor argues "the SLED report constituted impermissible bolstering of [Cromer's] testimony because it unduly emphasized her ballistics opinion, which remained her *opinion* about the critical 'match' of the gun that was found where [Taylor] told his friends it would be found." (emphasis in original). We disagree.

"Improper bolstering occurs when an expert witness is allowed to give his or her opinion as to whether the complaining witness is telling the truth, because that is an ultimate issue of fact and the inference to be drawn is not beyond the ken of the average juror." *State v. Douglas*, 367 S.C. 498, 521, 626 S.E.2d 59, 71 (Ct.App.2006), *rev'd in part on other grounds*, 380 S.C. 499, 671 S.E.2d 606 (2009). Generally, the prohibition against bolstering is for the purpose of preventing a witness from testifying whether another witness is telling the truth and to maintain "the assessment of witness

---

from the pistol. The State contends that Taylor purports to challenge the admission of only Exhibit 40, but gives record citations corresponding to Exhibit 41 and suggests that for this reason, we should hold the argument unpreserved for appeal. Based on our reading of Taylor's brief, we find that Taylor is challenging the admission of Exhibit 41 and that he has preserved this issue for appeal.

credibility ... within the exclusive province of the jury."
*State v. McKerley*, 397 S.C. 461, 464, 725 S.E.2d 139, 141
(Ct.App.2012). Here, Cromer's report was relevant to her
own testimony, not that of any other witness. Nor did the
report vouch for her credibility; rather, it was a written
representation of the findings on which her opinions and
testimony were based.

## CONCLUSION

We hold the trial court did not abuse its discretion in
refusing to allow Taylor to cross-examine Wilder about the
pending charges against him that were dismissed after Wilder
agreed to cooperate with the State. We also affirm the trial
court's admission of the SLED report documenting the link
between Taylor's pistol and the cartridge casings found at the
crime scene.

**AFFIRMED.**

HUFF and GEATHERS, JJ., concur.